The next case we'll hear this morning is United States v. George. And Mr. Brignac will hear from you first whenever you're ready. Thank you, your honors. May it please the court, Eric Brignac for Terry George, Jr. In order to show a Brady violation, Mr. George must show three things. The government had something that it needed to disclose, either because it was exculpatory or... The government agrees it violated Brady. The question is whether it was material, right? Yes. The government agreed that it violated Brady briefly in this case. Joint appendix 565, where the assistant United States attorney said there was a Brady violation. I don't know. I know the government has indicated how seriously it takes this. I'm sure that was not an offhand comment by the AUSA to question how far up it went. But yes, they then said they would actually like to hold that in abeyance. And we are here to discuss, your honors, materiality. And this was material. It affected our entire trial strategy. How would the trial strategy have been different had you found out about this inconsistent statement prior? We would not have called the government's case agent as our sole witness. The government didn't put on Agent Crumley. So that was weird. That was their case agent. They did not put him on. We put him on. That's pretty powerful, wasn't it? To put somebody on to testify that the government witness was lying. But we start our strategy, your honor. We tell the jury two things. We say, you are going to hear Kate. And it says the government's investigation was sloppy. They didn't even know who those two backseat passengers were. We put on Agent Crumley, fully expecting him to... All the while, you knew who was in the backseat. Your client knew exactly who was in the backseat. So it's not a surprise to you. It's a strategic question as to whether you were harmed. And you did cross-examine on it. You did argue it. You did impeach him with other evidence. And he did tell conflicting stories. One time he said Kate and another male. And the second time he said two cousins. Yes. And your honor, I think this is clear from the briefing. If we say that the only Brady material was the identity of those backseat passengers, then I think the district judge would have correctly held that, found that. But the whole point of this is that wasn't the core of what the Brady violation actually was. It forced not just our opening statement, but everything we did from that point onward. I think the Latka case... In the test, in the circumstance where you do have a statement that was not disclosed as it should have been, is what actually happens at the trial. Does the defendant have the opportunity to effectively use that information in the course of their case? We've already talked a little bit about this examination of the agent, which appeared to be pretty devastating for Mr. Frazier's testimony. But at the end of all that, the trial counsel for Mr. George noted that the ATF agent had testified that Frazier had previously identified the folks in the backseat as Brady and Chris, but we first learned that during today's testimony. But then he says, I'm not asking the court to do anything. I just want to put it on the record. So it struck me here at this point, there's no request for a mistrial. There's no request for a continuance to see if we can do something different in this case. There's no request for a limiting instruction, which might tell you that defense counsel thought this was pretty good. No, actually, your honor, respectfully, I don't think defense counsel thought this was pretty good. That's why we filed our motion for a mistrial. When we brought this up to the district court, he, at the time, acknowledged the problem with the timeliness. We are late in the game to permit more. That's what he said, joint appendix 391, 392. He was already signaling we're not going to do all of those things. And to get to your honor's point, all of these Brady cases are very fact specific. And one of the facts that this court has indicated should get to both materiality and timeliness is whether it was a case where the government actually affirmatively let this bad testimony stand. The Blankenship case, this court talked about the fact that one of the reasons it was not going to find a Brady violation is that the defendant had access to the material. It contrasted it expressly with the Supreme Court case, Banks v. Dredke, where a witness testified falsely, just as it happened here, and the government let it stand. And that got to the Brady prong because it says defense counsel should be able to rely on the government not letting false testimony stand. So we were, your honor, it was not until that last witness, Crumley, testified, and as you saw from the record, left our counsel stupefied, that we even know there was a truth to be found. Had there been not, it's absolutely not true. You're representing George, George was in the automobile, George knew exactly he was in the back seat. And I'm sure he could have shared it if it was material. The question is, this is Giglio material. This isn't even going to the crime. So the question is in Giglio is whether you had an opportunity or you lost the opportunity to impeach the witness. But the jury heard pretty powerfully that the witness had changed his story and heard from the government witness. And we're talking about impeachment evidence only in this case. Yes, it is impeachment evidence. It is Giglio, your honor, and to the extent this court believes that, you know, when Prince Wesley testified that this was the first time today, I changed my story for the first time today. I'd never told this story about Chris and Brody before, and he testified to that, and the government did not correct that on redirect. To the extent your honors think that is irrelevant, then yes, we- It's not irrelevant, but you're sitting right next to George, who knows differently. And George probably or could have related all that information in preparation for trial, who was there, who potential witnesses were, that type of thing. I just find it difficult when your client has the knowledge, you got to impeach Frazier on the stand. The evidence came in during trial. It was late. It was a violation, but the real question is, was it material? And the materiality comes to the impeachment ability with that. That's the whole violation here is on the impeachment. It didn't have anything to do with the evidence of the commission of the crime. It had to do with the reliability of Frazier as a witness, and my guess is he didn't get a lot of credibility on some of these things. And if I may correct, this gets to the nub of it, your honor. The very first thing you said is that defendant George knew, and he was sitting right next to us. Well, no, no. Even the preparation. I mean, counsel's going to ask George, do we have witnesses? Who is here? Anyway, I- Who were the other two in the back seat? They were his cousins, weren't they? Yes, the record shows they were his cousins. So, your honors, defendant George, we will accept for this record, knew who those individuals were. What defendant George didn't know, what only four people know, which was Prince Frazier, the case agent, the AUSA, and Prince Frazier's state attorney, was that conversation two weeks before trial where he changed his story. Okay, and you didn't know that about that conversation, and you called Agent Cromley. What was your point of calling Agent Cromley, or what was going to be your point? What we were hoping to get out of Agent Cromley was the understanding that, hey, the government didn't bother investigating, didn't know who these back seat passengers were. Because remember, the video showed it was four males, and we think that they're sticking with the Prince Frazier statement of a male and a female. And the government knew two weeks prior who the individuals were, and they still didn't bother investigating. Right. But, your honor, what happens is we tell the jury in our opening that the government didn't even follow up on who these people were, and then we put Agent Cromley on the stand, and he testifies, we knew who they were. He told us two weeks before trial. And you still get to say, and yet they still didn't follow up and investigate these two people in the back. Right. But we had absolute... You know, but we still... But, your honor, we still had no opportunity to build our entire trial strategy around that. The Latke case from the Second Circuit... I don't understand that. What's the trial strategy you want? Well, for instance, we would not have effectively lied to the jury and told them that they were going to hear about Kate. We wouldn't have started our whole presentation to them with something false. But that was explained when it became clear during Agent Cromley's testimony that there was a prior inconsistent statement just two weeks prior. Which, your honor, was the very last witness on the very last day of trial, and when we flagged this for the district court... It was shady. Well, it was shady, you know, I mean, this couldn't be in the record because it was discovery, it was never brought to the district court. On March 28th, so the interview happens with Prince Frazier on March 24th. On March 28th, the government sends us discovery about that interview. They say... I mean, it was actually short. I can read it. Then that's not in the JA. It can't be, your honor. Now, there's actually... I think there's a question, and I know your office is handling it as well, as to whether discovery that wasn't in front of the district court can be in the JA. There's a case being argued right now, the Sean Garrett, where I think the government... The interview was on March 24th. March 24th. On the 28th, they gave you... On the 28th, they said, on the 28th, they sent this letter, I write to advise you of the following information obtained during trial preparations relating to potential government witness Prince Frazier, provided the following additional information. Frazier stated on the night of the traffic stop, the officer showed him the Taurus .45 caliber handgun, which he denied possessing. Upon being shown a photo of the handgun, Frazier stated he had previously seen defendant in possession of the firearm at defendant's residence approximately a month prior to the stop. So the government... And so nothing about, he also said, oh, and by the way, the two people in the back, nothing. Nothing. And... That's extra shady. Out of an office... I feel you're in a better position to say that than I am, Your Honor. But I will say this, what this shows is that upon hearing Prince Frazier change his story two weeks before trial, the government sends us additional inculpatory information. Prince Frazier saw your client with the gun. Maybe you want to take a plea. Maybe you want to take a plea. And I don't know when this would have come out. We stumbled upon this. It only came out because you called the government's witness. We stumbled upon it. We, whatever we expected Agent Crumley to say, we certainly didn't expect him to say, no, no, Prince Frazier did change his story two weeks before trial, we just never got around to telling you. Can I shift gears for a minute? Please. How is the ammunition conviction, why doesn't that stand alone? He was sitting on the ammunition. Your Honor, I think it doesn't stand alone for two reasons. One is we get into in our briefs that the government told the jury, look, you know, this ammunition and this gun are one and the same. They had the whole story about how he probably separated them, et cetera. That's in the briefing. I also want to point to the joint appendix. Just look at the government's exhibits, joint appendix 478. So what's this explanation that I'm sitting on top of, I think, a double mag? People are going to know that. I would ask your honors to look at joint appendix 478 and 479. That's a picture of the magazine. It's just a, you know, it's just a sort of metal rectangle. 483, it's a Ford, not a Ford Taurus, it's a Chevy Tahoe. It's a big seat. It's a big car. So yes, it was under his seat. The evidence showed that. There was no reason to dispute it. But could have been any number of things. Could have been a cell phone. Could have been shifted around. This wasn't a tiny little car. I think it's shorthand to say he was... I don't think most modern gun magazines feel much like a cell phone. And your honor, I guess all I would say is I think we use shorthand to say he was sitting on it. I think the evidence shows at most that it was on the seat with him. But maybe more to the point, the government at trial didn't think that the ammunition stood alone. The government at trial did everything it could to tie the gun and the ammunition together. And having done that, having made that argument at trial... It was a gun physically. It was right to the right side between the doorstop and the seat, right? So it's a Chevy Tahoe, your honor. There's a picture of it in the joint appendix. It's an SUV. So if I'm sitting in the seat here, it's sort of between the front seat and the back seat. I think he could reach it. The testimony was that he could reach back and reach it, whoever he in the front seat, and the backseat passengers could reach it. It's on what they call the B pillar, which I guess is just the part of the car between the front and back window. Right. But the firearm was facing the back passenger seat, right? Honestly, your honor, I don't remember. I'm sorry. I can certainly... It's in the record somewhere. I don't know why a back passenger would aim a gun at themselves. Right. And you know, I guess this comes down to, we're not sure why they'd aim a gun at themselves. Okay. But there's a lot of speculation. Even if there's joint access to a firearm in this situation, that's sufficient for any one of them. It's just perhaps the guys in the back seat weren't felons. And I'm glad your honor phrased it that way. If we were here on a sufficiency of the evidence challenge, we would lose. The evidence was sufficient. His defense is that he didn't know what was there. This wasn't the gun was there and we all had control over it, but they had more than me or something like that. We're saying the trial was fundamentally unfair. We didn't have an opportunity to, I mean, the government kind of, again, good faith or bad faith or whatever faith, we had to litigate this with, you know, one hand tied behind our back. You could have clearly called the cousins in the back seat if that was their gun. You could, you clearly could have called it. George would have told you that this belonged to my cousin, not me. And you could have called either one of them. You knew it from the get-go. Yeah. May I respond, your honor? Please. Yes. So, I mean, obviously the government has the burden of proof. We had no obligation. I understand that, but you're talking about you lost your own opportunity because you had a lack of knowledge, but you didn't have a lack of knowledge. You were trapped at trial by the late disclosure. It's not proper. The lack of disclosure is not proper, but I don't think that's the issue before us. I think the government is not trying to defend it. I think the question is whether the failure that the government committed here was material. And I would just say, your honor, and I'm happy to talk more on rebuttal, I think the Blankenship case really gets to this idea that was, I think your honor was on it, the mine safety case. And the discussion is, in part, how there's a difference between a Brady violation when the government lets false testimony stand and a Brady violation where it was just unknown. Thank you. All right. Ms. Brown. May it please the court, Lucy Brown for the United States. The government fell short of its own high standards in this case, and we apologize for that. Can you pull the speaker right around to you? Certainly, your honor. I apologize. The government fell short of our own standards in this case, and we do apologize for that. Our mistake was regrettable. It is regretted. But we are asking this court to affirm the district court's holding that it does not undermine confidence in the conviction in this case. We are under plenary review. You know, I understand your, and I think it's appropriate that the government acknowledges that. I mean, you're officers of the court, you have a higher duty in these cases. We do. But it amazes me still when a U.S. attorney's office has evidence, a Brady material, and doesn't turn it over. I know it's accidental and there are a lot of explanations for it, but I know if I were the prosecutor, I'd open my file every time. A lot of prosecutors do. They just open their files, let the other side look at whatever they want to look. And to not, and especially to disclose the information, the late acquired information about the evidence of a gun being seen in another location. Why wouldn't at the same time, he also has now identified two other, two different people in the back seat. That would have been easy to do, too. And he should have. And we apologize for that. No, I understand. Was that the full report of Agent Crowley that was turned over on March 28th? That's my understanding, is that there was that letter with that additional information. I'm not sure it was strictly inculpatory. I think it was used then. Was it a letter? Yes. That's my understanding. From the U.S. attorney's office rather than what was attacked. Was it a police report? Was it Agent Crowley's report? I don't think there was a report ever created. I think the letter was our notification of, hi, he just said these things in prep that we haven't previously known or told you. And they cross-examined him on that information. And the government cherry-picked what they put in that March 28th, it seems, in that March 28th disclosure. I think the AUSA did not appreciate the giggly nature of this statement and turned over what he thought needed to be turned over and did write that letter, which I, that decision was wrong. He should have turned over the inconsistency, but I do hope that there is some appreciation that this was an effort to fulfill our ongoing obligation. There was an error in judgment there, and we should have turned over the inconsistency. I mean, the government fell on its sword immediately. Yes, Your Honor, we did. Even when it may not have needed to. And I think the district court was correct that this was not a Brady violation, though our disclosure was later than our own policy. We did, and the question there was how can we best handle that and most carefully handle it, because it is important. And we did, to use Your Honor's term, fall on our sword. The question before this court is a little different. It's did the district court plainly err, and we do not think the district court plainly erred. Opposing counsel says his entire trial strategy would have been different, and they would not have called Agent Crowley at all, and much less as their sole witness. What's your response to that? I'm not sure that I've heard how the entire strategy would have been different, and when I've played this out in my head, I've come to a different conclusion, because my understanding is they still would have cross-examined the driver, Prince Frazier, on you told a lie. You're a witness, you're under oath, we don't believe you. You said it was Kate, then you said it was someone else. That's not true. Prince Frazier, regrettably, on the stand, doubled down and said, no, I never said that. Well, they couldn't then impeach him with Agent Crowley's report if it had existed. That's not proper. He doesn't have knowledge of that. The way to impeach him would have been to do exactly what they did, to call Agent Crowley and tell the jury, Prince Frazier lied to you about that. He did say this previously. And that would have played out exactly the same way. And I think the thrust of their case, as Your Honor mentioned They didn't say what previously? That, I'm confusing myself in my own hypothetical, that he had previously said Kate and some other person, the thing he lied about on the stand. They would have had to call Agent Crowley still to prove that he had initially been dishonest, that he had an inconsistent story. That still would have had to happen. So I don't think the strategy would have been different, because that would still have been the way. And then the thing about what Agent Crowley found out two weeks prior would have come out anyway in the same way that it did? I don't know when that would have come out. It probably would have. Because that's the problem. That's what they're, in part, complaining about. So I think the problem, from a Brady standpoint, is the inconsistency. That is the favorable evidence. And that did come out on the Driver's Direct. And that is something they knew, that he was lying about Kate and another person. They knew that all along. Because they knew, as your honors have pointed out, he knew who was in the back seat. So when they got a police report that said the Driver identified Kate and another person, they knew that was a lie. They knew they could cross-examine him. Isn't the real issue here, I think everybody accepts government should have disclosed this, once that factual information entered into the trial, was the defendant in a position to effectively use that so that they were not prejudiced in having the case determined? So I think that's the issue that you need to address, is why were they able to effectively use it? They were able to effectively use it because they cross-examined the Driver on his inconsistency, among a litany of other ways they cross-examined the Driver, including on his credibility related to this case and other matters. So they were able to use it then. They were able to shore that up by calling Agent Crumley to say, yeah, he told us Kate and someone else, he told us this other person, to refute his assertion on the stand that he had never said Kate and another person. And they were able to close on it, and actually they opened on it as well, about do not believe Prince Frazier. That was a central thrust of their trial strategy, and that certainly is upheld by their demonstration through Agent Crumley that he said something on the stand that wasn't true. They told you in the opening not to believe him, and in the closing they likened him to a small child who couldn't keep his story straight. They said they had a lack of a credible witness. They said his story changed every time he told it. They were able to use that, and I think their not moving for a mistrial is an indication that they thought they had used it effectively. The cross reads devastatingly to Prince Frazier and to his credibility, and I think that was a calculated choice by the defense not to move for a mistrial, but it does speak to their understanding of how material this issue was, given the way the trial played out. Was there one count and one conviction here for felon in possession of ammunition and a firearm, or were there two? It was one count. There was a special verdict form, so there were separate jury findings. Yes, he possessed the firearm, and yes, he possessed the ammunition. And that ammunition is a way to avoid a lot of the complications of this matter because of that special verdict form. Because the jury found he possessed the ammunition beyond a reasonable doubt. As we've discussed, he was sitting on top of it. It's like sitting on a length of pipe. He's going to be aware of that, and that's what the jury found, that he knowingly possessed that ammunition. And I want to take exception to the characterization that the government provided in its closing argument saying these two have to be linked. That's not what the government said, and the context on JA-436 is very clear. The government talked about that ammunition unto itself. It said the things I just told you. He was sitting on it. You would have known it was there. It was directly under his person, not even under the seat, under his body, covered only by that thin, stretchy seat cover that they used to demonstrate above at trial. The statement that they were one and the same meant the magazine fit in that firearm that was at his side. That was using the magazine, which was clearly possessed, to strengthen the possession of the firearm. Does the record reflect or was the ammunition in the magazine the same caliber as the firearm? Yes, Your Honor. And that's why the government said one and the same. It just meant that magazine strengthened the possession of the firearm, and those were separate findings. That ammunition conviction is not influenced in the way the firearm is by the testimony of Prince Frazier. It does not have that same influence. Now, the testimony of Mr. Frazier, the district court found, if you excised it entirely, the jury still had sufficient evidence to find the defendant guilty of both that magazine and the firearm, and we would think that is correct. Mr. Frazier certainly spoke to that, but the central evidence there was its positioning, the testimony of the law enforcement officers. That was what the district court found as well. So this was not material to the ammunition, certainly, and it wasn't material to the firearm for a number of reasons we've discussed. I do think that limiting instruction provided by the district court before openings does a lot of work to this one statement that said, you will hear this testimony from Prince Frazier. The district court had just told the jury, this is an evidence. Essentially, don't put too much stock into it. This is what the parties expect it to show. We didn't close on that. No one ever said they were dishonest with you in their opening. That simply wasn't the impact. And if anything, as Judge Thacker rightly pointed out, that strengthens the argument that they even knew who those people were, and they still didn't go out and subpoena them, they still didn't investigate and talk to them. That impact from the opening is not what has been portrayed. Well, the opening, to be fair, you don't like to justify mistakes that have been committed in the trial, but the reference to not identifying who was in the back, Kate and nobody else, the point in the opening statement was the government didn't do an investigation. That's right. It wasn't that we don't know who it is or why didn't they bring them. They just said they didn't do an investigation and never found out who they were. That's right. They knew when he was making that statement who they were. That's right, Your Honor. So it's a little bit off-center on that. That's right. The thrust of the opening was there's no forensic evidence linking our client to this gun, and the government did an incomplete investigation. And not knowing who those people were in the back seat would underscore that, but knowing who they were probably underscored it even more because there still wasn't an investigation of those people in the back seat. So the impact of the opening is not what has been represented. Beyond that, I'm happy to speak on any of the other issues that we've raised in our brief if the Court has any questions. Otherwise, I would... Thank you. Thank you. We'll hear from Mr. Brignac. Thank you, Your Honor. Just to get to your question, Judge Agee, it was initially indicted as one count, just the gun. The superseding indictment, gun and ammunition, still one count. A little weird, the jury instructions at JA-425 only mention the gun, but we agree with the government that the special verdict form does mention the gun and ammunition. There was a stipulation to the ammunition. My guess is the government, when it submitted the jury instructions, were probably basing that on the original indictment. But, I mean, that right there shows maybe a level of not quite precision that we want. If we had known what Prince Frazier had said... The defense counsel also reviewed the jury instructions and had... Yes, and we're not, Your Honor, just we're not saying that the ammunition was not properly in front of the Court. We're just... Your Honor wanted to understand the record, and I was giving my two cents there. You know, if we could have cross-examined Prince Frazier, knowing what he said and when he said it, we could have gotten him, possibly, hopefully, to admit the truth when he knew we knew it. Instead, we had to call Agent Crumley, who, among other things, the government was then, and the district court even said we opened the door by calling him, was then able to talk about how our client was so reluctant to take a DNA test, which, you know, isn't real evidence, but if I'm sitting on the jury, we didn't want the jury to hear that, but we had to call Crumley because we couldn't get what we needed to get out of Prince Frazier. The Lotka case from the Second Circuit, Your Honor, we cite in our briefs that talks about how trial strategy is... That's a good argument, because at the beginning, when I asked you what you would have done differently, you said we wouldn't have called Crumley. Crumley. We wouldn't have called him, and certainly not as our only witness. Yes. And now you're saying that because you did call Crumley... Right. ...but you didn't know this information, that opened up a whole host of other things damaging to your client. Exactly. That's a stronger argument than I think you made before. And I'm glad I made it now, because, well, I mean, it is frustrating... Once the trial counsel knew that, though, in this context, with a failure to disclose, he could have asked the district court for a continuance and to recall Frazier. By that point, Your Honor, Agent Crumley had already testified. He'd already gotten this extra bad evidence about the DNA in front of the jury. We could have, we should have been allowed the right. March 28th, they could have sent us a letter giving us the truth. When we gave our opening statement, they could have called a sidebar, told us the truth. When Prince Frazier lied on the stand and they redirected him, they could have gotten the truth out. They could have. They had so many opportunities to do this, and I know that whether it's a mistake or not... Right, but the bottom line test here, isn't it, is will the defendant have the opportunity to negate whatever the impacts are? And I'm still struck by the failure to ask for an instruction, no contemporary request for a mistrial, no request for a continuance. They could have thought about it some more and gone out and called the cousins or called Mr. Frazier back for a redirect. But it didn't do any of that. We didn't, Your Honor. When we flagged this for the district court, the district court said, you know, I kind of expected you to mention Brady. It's, again, I have the quote, you know, it's late in the game. So he was signaling to us, you know, that horse is out the barn. And I think the reason he made that error is he did not realize that, again, it was Agent Crumley's testimony that was what really sort of got to us, and that's when we finally learned the truth. He thought, erroneously, that it was when Prince Frazier testified and we had the overnight recess, et cetera. My time is up. I'm happy to answer any more questions. Thank you very much. And if there are none, we would just ask for a vacation and remand of both cases. Thank you. Thank you. We'll come down and greet counsel and take a short recess.
judges: Paul V. Niemeyer, G. Steven Agee, Stephanie D. Thacker